## SHERROD v. RHODES.

1. An accommodation drawer is a surety, and entitled to notice, although he had no funds in the hands of the drawee.

2. In such a case the fact that the drawer was indebted to the acceptor, for whose use the bill was drawn, in a sum equal to the amount of the bill, will not dispense with notice of the dishonor of the bill, unless the bill was drawn in payment of the debt.

3. A bill being drawn by R, for the accommodation of an incorporated company, to enable it to raise money by its sale, and the bill not being paid at maturity, the treasurer of the company informed R of that fact, and that the holder threatened suit, but would take a good bill for the amount which he urged R to draw, as he was indebted to the company in about that sum. R, in his answer, after stating his resources, says, " It would afford me great pleasure to do as you wish, but I think from the above expose you will agree with me it would be improper to do it"—held, that this was not a waiver of notice of the dishonor of the bill.

4. Accommodation endorsers as such merely, are not liable as co-sureties to contribution. To constitute that relation between successive accommodation endorsers, there must be an agreement to that effect between them, or some fact or circumstance must exist from which such an agreement can be inferred.

5. If the last indorser of a bill be notified of its dishonor, if he wishes to hold any prior party on the bill liable to him, he must give him notice, unless due notice had previously been given to such prior party by the holder.

6. Where the court agrees to give an erroneous charge, if the party asking it will do an act which the court has no power to require him to do, it is error, as it is impossible to know that the party has not been injured thereby.

WRIT of Error to the Circuit Court of Tuscaloosa county.

Assumpsit by Sherrod against Rhodes, to recover the amount of three bills of exchange, each for $6,034. The declaration contains counts on each bill, and also the common counts. The cause was tried at the Fall term, 1842, upon the issues of *non assumpsit*, payment and set-off, when a verdict was found for the defendant; and on this he had judgment.

The case made by the plaintiff at the trial is as follows :

All the bills are dated at Decatur, on the 1st October, 1837, drawn on and accepted by David Deshler, with the addition to his name of Treas. T. C. & D. R. R., payable at the Union Bank of Louisiana. The first was drawn by James T. Sykes, in favor of the defendant; and endorsed by him and the plaintiff.— The second was drawn by A. P. Christian, in favor of Sykes; and endorsed by him, and also by the defendant and the plaintiff. The third was drawn by the defendant, in favor of Christian; and endorsed by him and the plaintiff. The plaintiff at the date of the bills was the President of the Tuscumbia, Courtland and Decatur Rail Road Company; the defendant was a director, and the other parties members of the same corporation. It was agreed between these parties that the bills now sued on should be made by them for the accommodation of the corporation.—

Sherrod v. Rhodes.

The bills were made and negotiated to Yeatman, Woods & Co., who were strangers to the corporation, by its treasurer. At the time the bills were drawn, and from thence until they fell due, Rhodes had no funds in the hands of the treasurer of the corporation, but during the whole time, and up to the trial, was indebted to it in a sum larger than the amount of the bill drawn by him. A system of financeering was commenced by the corporation in 1833, and had been continued to the date of these bills. The mode was, for the members of the corporation, among themselves, to draw bills upon their treasurer, let him accept them, endorse them, and when those bills fell due, or were about to fell due, if the treasurer had funds of the company to appropriate them to pay the bills so due or falling due ; and if not, to have new bills made in the same way to take up the old bills. The bills in suit were made in the usual ordinary mode of financeering adopted and pursued by the corporation. The plaintiff had agreed, as he was very wealthy, and his name a weighty one, that he would endorse any bills the members of the corporation would make in this way, if they would let him be the last indorser.

The bills were not paid at maturity, and Yeatman, Woods & Co. afterwards sued the plaintiff, and recovered from him the whole of two of the bills, and the balance due upon the third.— He paid on these bills an amount exceeding fifteen thousand dollars.

Notice of protest of the bill drawn by Rhodes was sent to Tuscumbia ; but he lived near Blount Springs, where there was a post office.

The notices upon the other two bills were sent to Rhodes at Blountsville ; but Blount Springs was much nearer to Rhodes' residence than either Tuscumbia or Blountsville, and that was the office at which he received his letters and papers.

Deshler, the treasurer of the corporation on the 16th Nov. 1838, wrote to Rhodes, as follows :

Dear Sir,—Two of the bills held by Yeatman, Woods & Co., which were due at New Orleans, in May and June last, for about $6000 each, are still unpaid, and by a letter from Y, W & Co., some few weeks since, I discover they are becoming impatient, and I fear unless we come to some satisfactory arrangement very soon, they will commence suit. They are willing to take good bills on New Orleans, and I have written to them, promis-

ing that I would endeavor to procure such, and arrange the debt. My calculation is upon you and Maj. H. You are indebted to us to an amount exceeding one of those bills, and I will ask of you, if you can possibly do it, to send me a bill on New Orleans, for say $7000, to mature in May or June next; or if you would prefer to draw on Mobile, it would perhaps answer. Please let me hear from you on receipt, and oblige.

P. S.—I wrote you at Blount Springs, 30th ult., on the same matter, but presume you never received my letter.

Rhodes answered this on the 12th December of the same year, in these terms from Tuscaloosa.

Dear Sir,—Your letter of 16th ultimo, came to hand by last mail and contents observed. I should have answered it from Fairfield, but a week would have elapsed, as we have but one mail a week. You wish me to send you my bill for $7000 on New Orleans or Mobile; that is impracticable, as I should not have the means to pay it. I owe this winter and spring, about $25,000 nearly all in bank, which will absorb my crop at 12 1-2 cents. I have large debts due me in N. Alabama, say about $11,-000, but I learn that I may not expect enough from that source to pay what I owe there—about $1,500. It would afford me great pleasure to do what you wish me, but I think from the above expose, you will agree with me, that it would be improper to do so.

The bills mentioned in this correspondence were shown to be, two of those now sued for. On this state of proof, the plaintiff requested the court to instruct the jury,

1. That although Rhodes had not received legal notice of protest, yet that so far as the bill drawn by him was concerned, inasmuch as he had no effects at any time in the hands of the acceptor; but on the contrary, owed the company, he was not entitled to notice of protest. This the court refused to give, but charged the jury, if they believed the testimony that Sherrod was a party to the creation of the bills in the manner described as between him and Rhodes, that Rhodes was entitled to notice, and a recovery could not be had on the bills, unless it was proved that Rhodes had received regular notice.

2. That the correspondence between Deshler and Rhodes, contains an acknowledgment of a liability to pay said bills, and was a waiver by Rhodes of laches of notice. This was refused, and the jury charged that the correspondence contains neither a pro-

mise to pay, nor an acknowledgment of a liability to pay these bills, or either of them; and that there is contained in it no waiver of *laches* of notice.

3. That as between Rhodes and Yeatman, Woods & Co., Rhodes was not entitled to notice, and as the said bills had been collected from Sherrod, the last endorser, that upon the money counts of the declaration, Sherrod could recover the amount he paid upon the bill drawn by Rhodes, as so much money paid, &c., by Sherrod, for the use of Rhodes. This was refused.

4. That if the jury believed from the evidence, that the drawers and endorsers of these bills were members of the Tuscumbia, Courtland and Decatur Rail Road company, that these bills were drawn and endorsed to be accepted by the said company, and that the said company might sell the bills to raise funds for their benefit; that the bills were so accepted and sold to Yeatman, Woods & Co. for that purpose, and were by the company permitted to be dishonored; and that afterwards Sherrod as the last endorser was compelled to pay the bills to Yeatman, Woods & Co., by judgment and execution, that then the drawers and endorsers as between each other, were to be considered as sureties for the company, and therefore that the plaintiff is entitled to recover of the defendant one third of the amount paid by the former as contribution.

This was refused, unless the plaintiff would abandon his claim to a recovery for the whole amount against the defendant as the drawer and endorser upon the bills, which the plaintiff declined, and excepted to the several charges given and refused.

The assignment of errors opens all the points ruled by the Circuit court.

Peck and Lindsay, for the plaintiff in error, made the following points :

1. The defendant was not entitled to notice of dishonor of the bill. [9 Porter, 303 ; 2 Ala. Rep. 368.]

2. The correspondence with Deshler contains a waiver of notice, if otherwise the defendant was entitled to it. [7 Porter, 184; 2 Camp. 188 ; Bull. N. P. 276 ; 2 Stew. 713 ; 2 Camp. 106, 310; Chitty on Bills, 7 ed. 234, 235, 236, chap. 5, 7th head.]

3. The bill in the hands of Yeatman, Woods & Co. could be

recovered without notice. [2 Ala. Rep. 368.] And the plaintiff paying the bill is entitled to stand in their position.

4. Under the circumstances, the plaintiff is entitled to contribution. [Brahan & Alexander v. Ragland, 3 Stew. 258, 266; Farmers' Bank v. Van Meter, 4 Rand. 553; McDonald v. McGruder, 3 Peters, 470.]

COCHRAN and HUNTINGTON, contra.

ORMOND, J.—The questions of law presented on the record are, 1. Was the defendant entitled to notice of the dishonor of the bill drawn by him. It is argued that he was not entitled to notice, because he had no funds in the hands of the drawee, and therefore could not be prejudiced by the omission to give him notice that the bill was not paid. The rule here relied on, applies only where the consideration for which the bill is drawn passes to the drawer; in such a case, he is the real debtor, and cannot allege the want of notice; but in this case, the bill was drawn by the defendant for the accommodation of the acceptor, by whom the proceeds arising from its sale was received. He therefore stood in the relation of surety to the acceptor, and was doubtless entitled to notice, as was held by this court in Shirley v. Fellows, Wadsworth & Co. [9 Porter, 300,] and again in Foard v. Womack, [2 Ala. Rep. 368.]

Nor does the fact that the defendant was indebted to the Rail Road Company for the use of which the bill was drawn, in a sum equal to the amount of the bill vary the case in the slightest degree. It does not appear that the bill was drawn in payment of the debt due the company, or that it was contemplated that the defendant should pay it at maturity, but the contrary is most conclusively shewn by the proof. It appears that this bill, with others, was made to raise funds for the Rail Road Company; that the company had been obtaining money in this way for some years previously, and that when the bills fell due, they were paid by the treasurer of the company, if he had the means, if not, other bills were drawn in the same way to take up the old ones. The indebtedness therefore of the defendant to the company, was an immaterial circumstance, which did not affect the defendant's right to notice of the dishonor of the bill.

2. Does the correspondence between Mr. Deshler, the treasu-

Sherrod v. Rhodes.

rer of the company and the defendant, establish a liability on the part of the defendant, or show a waiver of notice.

Mr. Deshler, in his letter to the defendant, informs him that the bills are still unpaid; that he had received a letter from the holders who were becoming impatient, and that he feared they would sue unless some satisfactory arrangement could be made. He proceeds to inform the defendant, that the holders would take good bills on New Orleans, and that he had written to them promising to procure such. He then reminds the defendant of his debt due the company, and tells him that he calculates on being aided by him, and another gentleman, who is named, and concludes by proposing that he should draw a bill on Mobile or New Orleans for seven thousand dollars.

The defendant, in answer says, it is impracticable to draw the bill, as he would not have the means of paying it, and proceeds to state the amount he has to pay during the winter and ensuing spring, and concludes by saying, " it would afford me great pleasure to do what you wish, but I think from the above expose, you will agree with me that it would be improper to do it."

It is certainly true that a promise by a drawer or endorser to pay a dishonored bill with knowledge of the facts, will be a waiver of the *laches* of the holder, in omitting to make demand or give notice. But we do not think any such promise was made in this case. Mr. Deshler does not intimate in his letter to the defendant that he was under any obligation to pay the dishonored bill, or even that the defendant knew that the bill was still unpaid; but after informing him that such was the fact, states that an arrangement can be made with the holders, by drawing another bill, which he urges the defendant to do, not because it was his duty to pay the dishonored bill, but because he was indebted to the company who had the bill to pay. It was then simply a request to the defendant to pay his debt to the company, and the fact of the dishonored bill is stated to show the urgency of the case, and as a reason why the debt due the company should be paid by the defendant. In this light it was considered by the defendant, who does not attempt to excuse himself for not paying the dishonored bill, but goes into a detail to show his inability then to pay his debt due the company.

The case of Gibbon v. Coggin, [2 Campbell, 188,] relied on by the plaintiff's counsel is entirely unlike this case. In that case,

the drawer of a dishonored bill of exchange was told it was dis-
honored and called on for payment; he answered, "that his affairs
were at that moment deranged, but that he would be glad to pay
it as soon as his accounts with his agent were cleared." Lord
Ellenborough held, that by this promise, he admitted his liability.
In this case, the promise was made in reference to the *dishonored
bill*, but in the case at bar, not only was there no promise to pay,
but the refusal was not in reference to the dishonored bill, which
it was not pretended the defendant was under any obligation to
pay, but respected another bill which the defendant was request-
ed to draw, for a reason having no relation whatever to his liabili-
ty on the dishonored bill. It is therefore very clear that no pro-
mise to pay the dishonored bill or waiver of the *laches* of the
holder, can be collected from this correspondence.

3. It is further insisted that as the holders knew nothing of the
circumstances under which the bills were drawn, defendant, as
to them, was not entitled to notice, and that as the plaintiff has
been compelled by suit, to pay the holders, he occupies the same
condition they were in.

It has already been shown that an accommodation drawer is
entitled to notice of the dishonor of the bill, and the circumstance
that the holder was ignorant of the fact, that the drawer was a
mere surety, will not vary the case. If he omits to give no-
tice, he does so at his peril, and assumes the burden of proving
that notice was unnecessary. The remaining part of the charge
assumes that the holder may, on giving notice to the last endorser
sue any *prior* party on the bill, but the law is clearly otherwise.
If the holder intend to sue the drawer and endorsers of a foreign
bill, he must give notice to each direct, and in due time. [Chitty
on Bills, 9th Am. ed. 367, and cases there cited.] If the plaintiff,
when he received notice of the dishonor of the bill, had notified
the drawer, that would have charged him, and would have enur-
ed to the benefit of the holder as well as the last endorser.
[Byles on Bills 164, Hilton v. Shepherd, 6 East. 14. See also 2
Camp. 208, 210, 273.] The defendant not having notice of the
dishonor of the bill, either from the holder or the plaintiff, as last
endorser, is discharged from liability.

4. The remaining question arises under the last charge of the
court. The charge moved for was, that if the jury believed that
these bills were drawn and endorsed by members of the rail road

Sherrod v. Rhodes.

company, to be accepted by the company, and sold to raise funds for the benefit of the company, and were in fact so sold and permitted to be dishonered by the company, and that afterwards the plaintiff, as last endorser, was compelled by the holder to pay the bills, that the drawers and endorsers as between each other, were to be considered as sureties for the company, and that the plaintiff was therefore entitled to recover from the defendant, one third part as contribution. This charge the court refused to give, unless the plaintiff would withdraw his claim to a recovery for the whole amount against the defendant as drawer and endorser of the bills paid by him.

The charge moved for, is founded on the assumption, that because the drawer and endorsers of these bills were members of the Rail Road Company, and drew and endorsed the bills to enable the company to raise funds, that they thereby became co-surities for the company, and therefore each liable to contribute an aliquot part, if one should be compelled to pay the whole.

In the case of Brahan and Atwood, [3 Stew. 247,] the contrary was held to be law, and that the fact merely, that two or more persons were successive accommodation endorsers for another, did not make them co-sureties, but that to constitute that relation there must be an agreement between them to that effect, or some fact or circumstance must exist from which it may be inferred that they intended to be bound as co-sureties, although they have not signed the instrument jointly, but successively. This case has been acquiesced in ever since as a sound exposition of the law, and is so in the opinion of this court, as is shown by the cases there cited. [See also McDonald v. McGruder, 3 Peters' 470.]

In this case, there appears to have been an agreement between the parties in reference to the drawing and endorsing of these bills for the purpose of raising money for the company, in which they all had an interest. What the effect of that agreement was, and whether it authorised the inference that as the money was to be raised for the benefit of a company in which all have an interest, that it should therefore be a common liability, was a question peculiarly for the consideration of the jury. But so far as we are informed by the record, that view of the case was not pressed on the jury, or urged upon the court as the law of the

case. It has been shown, that without an agreement to that effect, or some fact or circumstance from which such an agreement can be inferred, successive accommodation endorsers are not in law co-sureties; the only additional facts here, are that they were members of the company, and that the bills were drawn and endorsed for the benefit of the company; but conceeding that these facts would have authorised the jury to infer that there was any agreement between them to be bound as co-sureties, the court could not so determine, and therefore correctly refused the charge.

There is still another objection to the charge as requested. At common law, one surety who was compelled to pay the debt could only recover from another surety an aliquot part, or that sum which is produced by a division of the debt actually paid by the number of sureties, without regard to their solvency. [Cowell v. Edwards 2 B. & P. 268.] But the rule in a court of chancery is to divide the loss equally among the solvent sureties. This equitable rule has been made the rule at law by a statute of this State. [Meek's Sup. 352.]

By reference to the bills which are set out in the record, and which are the foundation of this suit, it appears that four persons united in drawing and endorsing them, the defendant having drawn one, and endorsed two, and the plaintiff being the last endorser on all. If these four persons, as the motion for instructions assumes were *co-sureties*, then if one should be obliged to pay the whole, if all the others were solvent, he could call on each for one fourth part, if one of them was insolvent, the sum for which the remaining solvent sureties are liable, would be increased to one-third part of the sum paid; and if two were in that condition, to one-half. The defendant could not be called on for one-third part then, unless one of the sureties was insolvent. Such may be the fact, but no such proof appears upon the record, and the charge was therefore abstract, as it assumes the existence of a fact which does not appear to have been proved or admitted.

From this examination, it appears that the court was justified in refusing the charge moved for; this however, the court did not do in unqualified terms, but offered to give it, if the plaintiff would abandon his claim for the whole amount against the defendant as drawer and endorser of two of the bills paid by the plaintiff.

We think it cannot be doubted that this requisition of the court, imposed as a condition on which the charge would be given, cannot be sustained. The theory of the action of *assumpsit*, is, that each count is a separate cause of action, and although most usually we know that in practice, the different counts are mere successive changes rung upon the same demand, yet each count may be, and frequently is, for a special cause of action. The plaintiff had an unquestionable right to proceed against the defendant in his separate counts as drawer and as endorser, and on the common count for money paid to his use, which would be the appropriate mode of demanding contribution from a co-surety. The court therefore had no power to require the plaintiff to relinquish any claim which he had a right to urge before the jury upon the declaration; and it has been shown that he had the right in this case, to go against the defendant either as co-surety for contribution, or on his special counts as drawer and endorser, or for both, according to the proof he might make.

Was he prejudiced by this improper requisition of the court? If the court charge the jury wrong upon an abstract question, that is, upon a proposition not warranted by any evidence in the cause, the party against whom the charge is given is not injured thereby, because the jury ought not to find for him without evidence. If, however, the court correctly refuse such a charge, and then charge the jury wrong in point of law upon facts in evidence, the cause must be reversed, as has been repeatedly held in this court,

That is not the precise predicament of this case, but we think the injurious results are the same in both. In the case first supposed, the cause is reversed, because in presumption of law, the party is injured by the error of the court, although he may have sustained no actual injury, as the jury might have been warranted in finding their verdict as they did, if the law had been correctly expounded. When the instruction under consideration, was moved for and refused, the court had virtually, by its previous charges, as the evidence was documentary, decided the case against the plaintiff on the special counts, and he had excepted to the charges so given. The acceptance by the plaintiff of the offer of the court would have been an abandonment of the exceptions so taken, and consequently of his right to urge them in this court. This the court had not the right to ask him to do.

It is impossible now, that it should be known that this improper

action of the court has not prejudiced the plaintiff. If the charge had been simply refused, it may have been again propounded in terms which the evidence authorised, and which the court would have been bound to give. Indeed, the court admitted the right of the plaintiff, to the charge in the terms in which it was proposed, but refused to give it for a reason which is not tenable.

In addition, the refusal of the court to give the charge asked for unless the plaintiff would abandon his claim on the first counts was equivalent to a declaration, that he could not, without such abandonment recover contribution. That this was well calculated to mislead the jury, declared as it was, in their hearing, if not absolutely certain, is at least highly probable, and according to our previous decisions render it proper that the judgment should be reversed. [Cothran v. Moore, 1 Ala. 423; Toulmin v. Lessesne & Edmondson, 2 ib. 359.]

Let the judgment be reversed and the cause remanded.